**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

TINA M. WRIGHT,                                        )
                                                      )
                Plaintiff,                            )
                                                      )
        v.                                            )        Case No. 1:21-cv-58-JPK
KILOLO KIJAKAZI[1], Acting Commissioner               )
of Social Security,                                   )
                                                      )
                Defendant.                            )

## OPINION AND ORDER

Plaintiff Tina M. Wright filed the present complaint seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her Title II application for Disability Insurance Benefits ("DIB"). *See* 42 U.S.C. § 405(g). The parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. *See* [DE 13]. Accordingly, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c). After carefully considering the Administrative Record [DE 17] and the parties' briefs [DE 25, 26, 27], the Court now affirms the Commissioner's decision.

While the ALJ's decision is not without some issues, as discussed below, the Court has carefully considered those issues in the context of the entirety of the ALJ's decision. Ultimately, the Court can follow the ALJ's reasoning in denying benefits, and that reasoning is supported by substantial evidence. Standing in the ALJ's shoes, it is possible this Court would have weighed

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security effective July 9, 2021, replacing the former commissioner, Andrew M. Saul. *See* Fed. R. Civ. P. 25(d).

some competing evidence in a different manner, but the Court's judgement in such matters should not be substituted for that of the ALJ.

**BACKGROUND**

**A.    OVERVIEW**

Plaintiff was 46 years old when she filed her disability application. She worked as a manager at Rent-A-Center for 16 years until sometime in 2014. After that, she worked as an account representative with a company called Superior Auto until November 16, 2018. She filed a Title II application for a period of disability and disability insurance benefits on February 8, 2019, alleging disability beginning November 16, 2018, as a result of multiple health conditions, including advanced diabetic peripheral neuropathy,[2] COPD with asthma, hypertension (high blood pressure), hyperlipidemia (high cholesterol), and depression with anxiety. Plaintiff alleged these conditions were further complicated by obesity. [AR[3] 21, 458]. She also alleges side effects from the numerous medications she takes for the above conditions.

At the request of the Social Security Administration (SSA), Plaintiff attended a mental status consultative examination on April 26, 2019, and a physical consultative examination on April 30, 2019. Thereafter, Plaintiff's application was denied initially on May 3, 2019, and upon reconsideration on June 27, 2019. Plaintiff then filed a written request for a hearing before an administrative law judge (ALJ), and a hearing was held on May 28, 2020. On June 26, 2020, the

---

[2] Peripheral neuropathy is "'[a] diabetes mellitus-related disorder [*see* footnote 4, *infra*] of the peripheral nervous system, autonomic nervous system, and some cranial nerves' that 'causes a dulling of the sensations of pain, temperature, and pressure, especially in the lower legs and feet.'" *Lewis v. Astrue,* 518 F. Supp. 2d 1031, 1033 (N.D. Ill. 2007) (quoting Stedman's Medical Dictionary 272690 (27th ed., 2006)).

[3] The Administrative Record ["AR"] is found in Docket Entry # 18. The page citations are to the Bates stamp numbers in the lower right corner of each page.

ALJ issued an unfavorable decision on Plaintiff's application. Plaintiff filed a request for review by the SSA Appeals Council, which was denied on February 23, 2021. This appeal followed.

### B.   MEDICAL RECORDS

Generally, Plaintiff's medical records contain treatment notes for her respiratory issues, for Type 2 diabetes mellitus,[4] for neck pain, and for depression and/or anxiety. Rather than recount all of that evidence, this section will focus on the medical records most relevant to Plaintiff's arguments—which primarily are those that reflect ongoing diabetes management from March 2016 through December 2019.

On March 15, 2016, Plaintiff was referred for management of uncontrolled diabetes to PPG Endocrinology, where she saw Nurse Practitioner (NP) Jessica Escobar. NP Escobar noted that Plaintiff was diagnosed with diabetes in 2010 or 2011, but had been off all of her medications since November due to loss of insurance. [AR 280 (she has not been taking cholesterol medication, blood pressure medication, or diabetes medications; has been out of "everything")]. Plaintiff's laboratory trends reflected uncontrolled A1C levels,[5] with a 7.4 reading when she was first diagnosed and a current reading of 11.3. Plaintiff complained of dizziness, chest pains, and neuropathy in the bilateral feet. "Known diabetic complications" were noted as including

---

[4] Type 2 diabetes mellitus, more commonly known simply as diabetes (*https://www.webmd.com/diabetes/diabetes-insipidus-vs-diabetes-mellitus* (last visited September 23, 2022), is an impairment in the way the body regulates and uses sugar (glucose) as a fuel. This long-term (chronic) condition results in too much sugar circulating in the bloodstream. Eventually, high blood sugar levels can lead to disorders of the circulatory, nervous, and immune systems. *See https://www.mayoclinic.org/diseases\-conditions/type-2-diabetes/symptoms-causes/syc-20351193* (last visited September 23, 2022).

[5] The A1C test is a blood test that measures average blood sugar levels over the past 3 months. A normal A1C level is below 5.7%, a level of 5.7% to 6.4% indicates prediabetes, and a level of 6.5% or more indicates diabetes. *https://www.cdc.gov/diabetes/managing/managing-blood-sugar/a1c.html#:~:text=A%20normal%20A1C%20level%20is,for%20developing%20type%202%20diabetes* (last visited September 23, 2022).

3

peripheral neuropathy. [AR 284]. Other symptoms included fatigue, thirst, and frequent urination. The treatment notes indicate that Plaintiff was currently monitoring her blood sugar levels at home once a day, and that her reading for that morning was 297.[6] A Review of Systems indicated a positive report for fatigue, dizziness, visual disturbance, asthma, cough and wheezing, chest pain, urinary frequency and nocturia, arthralgia (joint pain) and stiff joints, dizziness, paresthesia,[7] depression, sleep disturbance, and tobacco use. A diabetic foot examination was bilaterally normal for foot pulse[8] and for calluses or ulceration, but showed other abnormal results, including "callus to heel" in both feet and thickening of nail on right foot big toe. Monofilament testing[9] revealed "minimal evidence of neuropathy" on the right foot and "evidence of neuropathy" on the left foot. [AR 283].

NP Escobar reviewed the "ABCs of diabetes management" with Plaintiff, including A1C levels below 7, blood pressure below 130/80, and LDL cholesterol below 100, and indicated that, at present, Plaintiff's compliance was estimated to be fair. NP Escobar's plan to improve Plaintiff's compliance included emphasizing dietary modifications, particularly the elimination of soft drinks,

---

[6] Target blood sugar levels for people with diabetes are in the 70 to 180 range, depending on meals, exercise levels, and time of day. *See https://www.webmd.com/diabetes/normal-blood-sugar-levels-chart-adults* (last visited September 23, 2022).

[7] Paresthesia refers to having abnormal sensations such as touch or temperature (as opposed to hypoesthesia, which refers to a decrease in normal sensations). Usually paresthesia is described as a feeling of pins and needles or tingling on the skin. *See https://www.healthline.com/health/what-is-hypoesthesia#vs-paresthesia* (last visited September 23, 2022).

[8] A diminished foot pulse is an indication that a patient is at an increased risk of cardiovascular death or renal disease due to peripheral artery disease as a complication of type 2 diabetes. *See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6711125/* (last visited September 23, 2022).

[9] Monofilament testing is an easy, inexpensive test for detecting peripheral neuropathy in otherwise normal feet by assessing the loss of protective sensation. *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2775618/* (last visited September 23, 2022). More involved testing for peripheral neuropathy includes a nerve conduction study or an electromyography (EMG).

and recommending increasing exercise and performing twice a day blood sugar monitoring. To help control Plaintiff's blood sugar levels, NP Escobar put Plaintiff back on a long-acting man-made insulin called Toujeo (insulin glargine injection)[10] (which was noted as being covered by insurance), and added Glucophage (metformin), an additional medication to control high blood sugar levels,[11] with instructions for Plaintiff to call the office if her blood sugar levels during the day stayed above 180, in which case her insulin dosage would likely need to be increased. NP Escobar also prescribed a less expensive drug to replace Plaintiff's cholesterol medication, which Plaintiff had not taken since November due to cost, and continued Plaintiff's treatment for high blood pressure with the drug lisinopril and her treatment for peripheral neuropathy with the drug Lyrica (pregabalin).[12] [AR 285].

On June 21, 2016 (three months later), Plaintiff returned for a follow up endocrinology visit at which time she reported that her overall eating habits had improved and that she was drinking more water and less soda. Yet despite these improvements, Plaintiff complained that her blood glucose levels still seemed to be "up and down," with a 209 reading from that morning. Her A1C levels were down from 11.3% to 8.7%, and Plaintiff denied any episodes of hypoglycemia.[13]

---

[10] *See https://www.toujeo.com* (last visited September 23, 2022).

[11] *See https://www.webmd.com/drugs/2/drug-20009/glucophage-xr-oral/details* (last visited September 23, 2022).

[12] Lyrica is prescribed for feet pain caused by nerve damage due to diabetes. *See https://www. webmd.com/drugs/2/drug-93965/lyrica-oral/details* (last visited September 23, 2022).

[13] Symptoms of hypoglycemia (low blood glucose) include feeling shaky, nervous or anxious, sweating, chills and clamminess, irritability or impatience, confusion, fast heartbeat, feeling lightheaded or dizzy, hunger, nausea, color draining from the skin (pallor), feeling sleepy, weak or having no energy, blurred/impaired vision, tingling or numbness in the lips, tongue, or cheeks, headaches, coordination problems, clumsiness, nightmares or crying out during sleep, seizures. *https://diabetes.org/healthy-living/medication-treatments/blood-glucose-testing-and-control /hypoglycemia* (last visited September 23, 2022).

A Review of Systems indicated a positive report for eye irritation/redness, cough and wheezing, abdominal pain, urinary frequency and nocturia, arthralgias, sleep disturbance, and tobacco use. NP Escobar continued Plaintiff on metformin, increased the dosage for Toujeo at night, and added the drug glimepiride to Plaintiff's treatment plan. [AR 298].

On March 14, 2017 (nine months later), Plaintiff had another endocrinology follow-up appointment. Plaintiff's A1C reading was back up to 9.8% from her prior reading in June 2016 of 8.7%. NP Escobar observed that while Plaintiff did have laboratory work done the previous month, she had not been seen for diabetes management for eight months, and that, during that time, she had stopped taking Toujeo ("was making her sick") without calling to tell the endocrinology office of that decision. Also, she had been "drinking a lot of Sprite," and had no glucose readings to review because she had not been testing, saying she had lost her meter. Plaintiff reported that she had been ill with pneumonia since February and had a head cold that was settling in her chest again.[14] Her concerns were related to her sinus congestion, coughing and wheezing, and she said she had no concerns with her diabetes at that time. A diabetic foot examination showed bilateral calluses present (but no foot sores), bilateral diminished foot pulses, and bilateral abnormal filament test. It was noted that Plaintiff was past due for an eye examination and a referral was given. NP Escobar discussed diet/activity with Plaintiff, including her continued drinking of soda on a regular basis. Plaintiff agreed to resume taking Toujeo at a lower dose and to call the office if she was having any issues with the medication.  [AR 332, 334].

---

[14] Plaintiff was in the hospital with pneumonia, COPD and asthma on February 24, 2017. In an appointment with her primary care physician following that hospitalization, a Review of Systems was positive for sinus pressure, sore throat, night sweats, heartburn, cough, and wheezing. [AR 358]. Plaintiff's primary care physician observed that Plaintiff had uncontrolled diabetes *without complication* and *without* long-term use of insulin, and that she was overdue for a follow-up endocrinology appointment. [AR 400-401].

On May 24, 2018, more than a year after her last appointment, Plaintiff had another follow up endocrinology appointment. NP Escobar noted that Plaintiff's current symptoms/problems included hyperglycemia that had been worsening (no episodes of hypoglycemia). Her A1C that day was 13%, and she reported that she had not been taking Toujeo "because [she] didn't refill it." Her last labs had been done in February 2017, and she had last been seen in endocrinology in March 2017. NP Escobar wrote: "She was ill in February with cough and was started on prednisone then (sugars in the 600's), did not call us. Again has not seen us in over a year. She states was calling us for [T]oujeo refills but we didn't get calls." NP Escobar noted that Plaintiff did go for her eye examination, but her current monitoring regimen was "0-1 times a day home blood test – states out of strips. Home blood sugar records: has been out of strips for 2 weeks, last checked it was in the 250s." Plaintiff reported that she had no recent health concerns. In addition to not taking Toujeo, Plaintiff reported she had discontinued glimepiride ("off for 1 month") as well as her blood pressure and cholesterol medications. A foot examination revealed roughly the same results as before (bilateral abnormal filament test, presence of calluses (with absence of foot sores), and bilateral foot pulses noted as "present"). [AR 337, 340, 342].

NP Escobar wrote that there were "[h]uge barrier[s]" to Plaintiff's treatment, including her failure to check her blood glucose levels, her failure to take prescribed medicines, and her continued consumption of soft drinks. NP Escobar noted that she had a "[s]trong discussion" with Plaintiff about complications from diabetes, that Plaintiff's A1C levels were too high, and that the lack of information to go by, from not testing and failing to call to let the office know when she was out of medications, were problems. NP Escobar also noted that Plaintiff laboratory work was overdue. NP Escobar told Plaintiff to start taking the Toujeo, glimepiride, and metformin again, with the first two at increased dosages. [AR 342-43].

Between May and November 2018 (the alleged onset date when Plaintiff also stopped working), Plaintiff was treated for pulmonary complaints (bronchitis, chest pain, asthma, shortness of breath) and for depression with anxiety, but not for her diabetes.

On January 2, 2019 (just prior to filing her disability application), Plaintiff was seen by her primary care physician for medication refills and a follow-up regarding hypertension, hyperlipidemia, and anxiety. Her uncontrolled type 2 diabetes was noted as a chronic problem for which she was due for a follow-up per the endocrinology department. It was also noted that Plaintiff had not been taking her prescriptions for several months "for unclear reasons." Her medications were noted as controlling her problems, but compliance problems included failure to adhere to a proper diet. A Review of Systems indicated negative reports for fever and weight loss, blurred vision, cough, shortness of breath and wheezing, chest pain, or leg swelling, abdominal pain, bloody stools or stool change, rash, dizziness, sensory change, focal weakness, headaches, or polydipsia.[15] A physical examination was normal, including range of motion, respiratory signs, strength, and sensation. [AR 444].

On May 15, 2019, Plaintiff had another visit with her primary care physician at which she complained of a worsening hacking cough and chest congestion for the past two weeks. She was diagnosed with acute bronchitis/upper respiratory infection.

On July 3, 2019, Plaintiff attended another appointment with her primary care physician, during which her hypertension, hyperlipidemia, depression, anxiety, and back pain were assessed, but not her diabetes. Plaintiff's back pain was described as a chronic problem that was sub-optimally controlled and worsening. A Review of Systems indicated negative reports for fever,

---

[15] Polydipsia refers to abnormally great thirst as a symptom of disease (such as diabetes). *See* https://www.webmd.com/diabetes/polydipsia-thirsty (last visited September 23, 2022).

weight loss, blurred vision, cough, shortness of breath, wheezing, chest pain, leg swelling, abdominal pain, rash, dizziness, sensory change, focal weakness, or headaches. Plaintiff was given an injection and prescribed an anti-inflammatory (meloxicam) and muscle relaxant (cyclobenzaprine) for her back pain. [AR 495].

On September 10, 2019, Plaintiff returned to her primary care physician's office for a visit with NP Kari Rischling, with her chief complaints being depression and back pain, onset occurring two weeks earlier. She reported decreased appetite, energy, and interest, as well as crying, irritability, and feelings of hopelessness. She also reported chronic neck pain, with the current episode having started more than one month previously and gradually worsening. She felt the chronic pain was causing her increased anxiety and depression. A physical examination revealed tenderness in the cervical back, but normal range of motion, and no swelling, edema, deformity, or spasm. A spine x-ray was taken, which showed mild degenerative disc changes, but was otherwise unremarkable. Plaintiff was prescribed gabapentin (Neurontin)[16] for neuropathy and increased anxiety/depression, and an MRI was recommended. [AR 536, 538, 542].

Plaintiff attended a three month medicine check with NP Rischling on October 3, 2019. A Review of Systems indicated negative reports for fever, weight loss, cough, shortness of breath, chest pain, leg swelling, or dizziness, and positive reports for sensory change and headaches, and a review of Plaintiff's "chronic" problems included: (1) hypertension, controlled on medication without side effects; (2) hyperlipidemia, poorly controlled on medication without side effects (it was also noted that Plaintiff did not do her labs as ordered prior to her appointment); (3) anxiety/depression, with stable symptoms fairly well controlled on current medications without

---

[16] Gabapentin is used to treat pain from shingles (postherpetic nerve pain) and as an anti-seizure medicine. *See https://www.drugs.com/gabapentin.html* (last visited September 23, 2022).

side effects; and (4) cervical radiculopathy (pain that spreads into the arm, neck, chest, upper back and/or shoulders). For the last condition, it was noted that Plaintiff did not get an MRI done as previously planned because she thought she had lost her insurance, but she said she would reschedule it. Plaintiff also reported that she stopped taking the anti-inflammatory and muscle relaxant medications because they made her sleep for two days straight. She took the gabapentin and stated that it helped, but she noticed she was now getting headaches. In addition to these chronic conditions, a new problem was reported in Plaintiff's hands, which were red and swollen, and occasionally felt warm to the touch. Plaintiff reported the problem was getting worse, and the redness was now traveling up the left arm. NP Rischling recommended that Plaintiff  increase the gabapentin, start the anti-inflammatory medication again, and get the MRI done. [AR 528].

NP Rischling's October 3, 2019 treatment notes also discuss Plaintiff's type 2 diabetes mellitus, which is described as a chronic problem that was poorly controlled on medication without side effects, with "[p]ertinent negatives … includ[ing] no blurred vision, no foot ulcerations, no polydipsia [*see* footnote 15, *supra*], [and] no polyuria" or hypoglycemic complications. NP Rischling noted that Plaintiff had been referred to endocrinology but had failed to keep her follow-up appointments and had been taking medicines from a friend who passed away. Plaintiff reported that she did not check her blood sugars and was "scared to know" what her A1C level was. She also reported that she was taking the metformin and "has expired Toujeo but doesn't take this all the time." NP Rischling discussed with Plaintiff the harm diabetes mellitus does to her nerves, vessels, heart, eyes, and kidneys and the importance of complying with treatment, and Plaintiff voiced her understanding. [AR 528, 532].

An MRI of the spine on October 10, 2019 showed mild degenerative changes with a recommendation for physical therapy and, if desired, an orthopedic consultation. [AR 516].

On December 23, 2019, Plaintiff had an endocrinology follow-up with NP Escobar, at which time Plaintiff stated that she was interested in Dexcom, a continuous home glucose monitoring system. Plaintiff complained that "[b]oth legs hurt her and wake her up despite taking gabapentin."[17] Plaintiff's "current health concerns included "worsening neuropathy" and she complained that the gabapentin was not working and she had cramps in her legs that prevented her from sleeping. NP Escobar noted that Plaintiff was due for a foot examination, that she had no sores on her feet, and that she does not see a podiatrist. Her A1C level that day was 12.3%. Her diabetic medications at that time included Toujeo, glimepiride, and metformin, but she stated she had been without medications for about 3 months, and that she had no home blood sugar level readings for NP Escobar to review or monitoring regime in place. Plaintiff reported no episodes of hypoglycemia. The treatment notes indicate that Plaintiff had been last seen for an endocrinology follow-up on May 24, 2018; that she had been seen since then only by her primary care physician for multiple illnesses; that laboratory work had been done in July 2019 but no A1C levels were taken at that time; and that a note in the file stated that Plaintiff had been taking the medications of a friend who had passed away. A diabetic foot examination showed the same abnormal results as before. [AR 569, 573; *see also* AR 575 (noting abnormal foot exam results, with "thick callus, and wors[e] neuropathy to the left foot")].

NP Escobar's treatment notes indicate that she "was frank with [Plaintiff]" about needing "to show compliance and commitment," and that she would not order Dexcom for Plaintiff at that

---

[17] It appears from the medical records that gabapentin had been prescribed by Plaintiff's primary care nurse practitioner to treat neck and shoulder pain [AR 532], and it may have already been discontinued by the time of Plaintiff's endocrinology appointment [AR 572]. Earlier endocrinology records indicate that Plaintiff had been prescribed Lyrica for diabetic nerve pain in the feet [AR 277, 280, 282, 285], but that drug seems to have dropped off Plaintiff's medications list at some point. Plaintiff's list of current medications in her May 24, 2019 Disability Report does not include either gabapentin or Lyrica. [AR 214].

time because of all the missed appointments, no glucose readings, and an A1C reading of 12.3%. Instead, NP Escobar started Plaintiff on meal insulin and said that Plaintiff needed to return with monitoring data so that appropriate adjustments to her medications would be made. NP Escobar's treatment notes close by noting that "[a]lot of teaching [was] done on complications, improved diet (she still drinks regular soda on occasion), [and] why she's having muscle cramps." Overall, Plaintiff's compliance effort was noted as poor, with efforts to improve directed at regular blood sugar monitoring four times daily. [AR 575, 576].

### C.   CONSULTATIVE EXAMINATIONS

On April 26, 2019, Plaintiff attended a mental status consultative examination at the request of the SSA. The examiner noted that Plaintiff's gait and fine motor skills appeared to be unimpaired. Her affect was flat, however, and her mood suggested feelings of depression and anxiety. The examiner also reported that Plaintiff's "effort appeared to wax and wane on the assessment tasks," and that this lack of effort at times might have affected her performance on the assessment. Plaintiff's performance indicated "some issues with her level of cognitive functioning" and her "judgment and common sense appeared to be slightly impaired." Plaintiff's cognitive ability was reported as being in the low average to average range, but sufficient to perform comparable jobs to that which she had performed in the past. Her adaptive skills were estimated to be slightly less than her estimated cognitive ability. The examiner noted that Plaintiff appeared to be experiencing minor problems with her memory, but that her ability to sustain her concentration and persistence appeared to be unimpaired. The examiner concluded that Plaintiff "would likely have very few, if any, problems being able to concentrate and persist on her job responsibilities," adding that she "appeared to be experiencing symptoms consistent with Major

Depressive Disorder, and Generalized Anxiety Disorder, and may struggle to get along with her supervisors and coworkers due to her mental health issues."

On April 30, 2019, Plaintiff attended a physical consultative examination at the request of the SSA. A Review of Systems indicated positive reports for loss of appetite, fatigue, night sweats, headaches, dizziness, blurred vision, hearing loss, cough, shortness of breath, chest pain, edema, and nausea. Although the examiner noted that Plaintiff's chief complaints included "advanced diabetic peripheral neuropathy at least 5-7 years," he made no specific findings or comments related to that condition. The examiner found that Plaintiff could walk 1-2 blocks, stand for 2-5 minutes, climb 5 stairs, and lift up to 10 pounds. He observed no limitations in fine fingering skills, normal breath sounds, and normal extremities. Observing that Plaintiff did not have any assistive device such as a walker, cane, or crutches, the examiner reported normal findings for gait, station, and ability to squat, walk on heels, walk on toes, and tandem walk. He opined that Plaintiff could stand or walk for at least 2 hours in an 8 hour day, and that she could use the upper extremity for lifting/carrying less than 10 pounds frequently or over 10 pounds occasionally. He described the following as all being normal: posture, ability to get on and off the table, stamina, ability to ambulate effectively, muscle stretch and tone, grip strength, strength in the upper and lower extremities, reflexes, sensory system, and range of motion in all areas, and found no pain, swelling, or stiffness, and no enlargement or effusion. The examiner did note a positive finding for lower back pain in the straight leg test in both the seated and supine position.[18] The examiner concluded that Plaintiff's chief problem was her COPD and shortness of breath, and that she needed to lose some weight and stop smoking.

---

[18] A positive straight leg test could indicate possible disc impairment or nerve root irritation. *See https://www.physio-pedia.com/Straight_Leg_Raise_Test* (last visited September 23, 2022).

### D.   AGENCY REVIEWERS

On May 1, 2019, the agency reviewers at the initial level found that the objective medical evidence established that Plaintiff's primary impairment was diabetes mellitus and that her secondary impairment was depressive, bipolar and related disorders. The examiners found that both of these impairments qualified as "severe." The only Listing impairments considered were for Depressive, Bipolar and Related Disorders and Anxiety and Obsessive-Compulsive Disorders. Plaintiff's mental functioning was found to be "no more than mildly impaired." For Plaintiff's physical RFC, the state agency reviewer found that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently; that she could stand and/or walk, as well as sit, about 6 hours in an 8 hour workday; and that she had no other exertional or non-exertional limits. These findings were confirmed at the reconsideration level on June 27, 2019, after the state agency reviewers took into consideration Plaintiff's additional allegations of chronic and recurrent upper respiratory infections and related treatment history. An additional Listing for Peripheral Neuropathy also was considered at that time.[19] The physical reviewer concluded that a review of the overall evidence supported the initial decision.

### E.   HEARING TESTIMONY

At the hearing, the ALJ first asked a series of questions about Plaintiff's past work history, and then questioned her about whether she had ever been restricted from driving. The ALJ then asked questions about Plaintiff's neck pain and physical therapy sessions for that pain in December

---

[19] The Listing for Peripheral Neuropathy is shown by either (A) Disorganization of motor function in two extremities resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use of the upper extremities; or (B) marked limitation in physical functioning *and* in one of area of mental functioning (understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself). *See 2*0 C.F.R. Part 404, Subpt. P, App. 1, § 11.14.

2019 through February 2020. The ALJ asked whether Plaintiff's medications were helping, and Plaintiff testified they were "in some way, but then I have other problems. … [T]hey're almost getting sorted out." For instance, Plaintiff testified that she was waking up in the middle of the night … because [her] feet and [her] hands were burning…. But since [she was prescribed] … [g]abapentin, [she] do[esn't] wake up as much." She testified that she has never had any nerve conduction study or EMG done to assess nerve damage in her feet. She reported having problems with the muscle relaxer for her back pain, and that she gets dizzy spells, which she thinks is from the combination of the blood pressure medicine and diabetic shots, but "it's not happening as much now." She agreed that she does not use a cane, walker, or wheelchair to move around, and that she takes medications for her mental health issues prescribed by her primary care doctor but has not had inpatient treatment for mental health issues or engaged in any therapy with a counselor or psychologist. She stated that she believes her diabetes had something to do with being terminated from her last job at Superior Auto, and said that the diabetes was still out of control but she was getting better numbers and NP Escobar recently increased her dosage of Toujeo. She also reported that she has not attempted to get any kind of work since her job with Superior Auto ended in November 2018 because she was having so many problems even doing daily house chores.

## FIVE-STEP EVALUATIVE PROCESS

To be eligible for Social Security disability benefits, a claimant must establish that she suffers from a "disability," which is defined as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The ALJ follows a five-step inquiry to determine whether the claimant is disabled. The claimant bears the burden of proving steps one

through four, whereas the burden of proof at step five is on the ALJ. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

At the first step, the ALJ asks whether the claimant has engaged in substantial gainful activity during the claimed period of disability. An affirmative answer at step one results in a finding that the claimant is not disabled and the inquiry ends. If the answer is no, the ALJ moves on to the second step, where the ALJ identifies the claimant's physical or mental impairments, or combination thereof, that are severe. If there are no severe impairments, the claimant is not disabled. If there are, the ALJ determines at the third step whether those severe impairments meet or medically equal the criteria of any presumptively disabling impairment listed in the regulations. An affirmative answer at step three results in a finding of disability and the inquiry ends. Otherwise, the ALJ goes on to determine the claimant's residual functional capacity (RFC), which is "an administrative assessment of what work-related activities an individual can perform despite his limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). At the fourth step of the inquiry, the ALJ determines whether the claimant is able to perform past relevant work given the claimant's RFC. If the claimant is unable to perform past relevant work, the ALJ determines, at the fifth and final step, whether the claimant is able to perform any work in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). A positive answer at step five results in a finding that the claimant is not disabled while a negative answer results in a finding of disability. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); 20 C.F.R. § 404.1520(a)(4).

## THE ALJ'S DECISION

The ALJ made the following findings relevant to Plaintiff's DBI application:[20]

---

[20] The paragraphs listed herein correspond with the paragraphs in the ALJ's decision.

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2.     The claimant has not engaged in substantial gainful activity since November 16, 2018, the alleged onset date.

3.     The claimant has the following severe impairments: chronic obstructive pulmonary disease (COPD)/asthma and obesity. In addition, she has the non-severe impairments of diabetes mellitus, neck and shoulder "pain," and anxiety and major depressive disorder. The claimant's complaints of headaches/migraines was not a medically determinable impairment.

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.     The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except the claimant can occasionally climb stairs or ramps, and stoop; she can never crawl, crouch, kneel, or climb ladders, ropes, or scaffolds. No concentrated exposure to moving machinery or unprotected heights. The claimant can balance commensurate with performing the activities outlined in this residual functional capacity. With no concentrated exposure to fumes, dust, odors, gases, and poor ventilation.

6.     The claimant is capable of performing past relevant work as a Sale manager, sedentary as generally performed; and Store Manager, light as generally performed. In the alternative, the claimant was 45 years old on the alleged disability onset date, which is defined as a younger individual age 19-49, has at least a high school education and is able to communicate in English. Transferability of job skills is not material. There are other jobs that exist in significant numbers in the national economy the claimant can perform, considering her age, education, work experience, and residual functional capacity, including Checker, Routing clerk, and Mail sorter.

7.     The claimant has not been under a disability, as defined in the Social Security Act, from November 16, 2018 through the date of the decision.

[AR 23-31].

## STANDARD OF REVIEW

The question before the Court upon judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) is not whether the claimant is in fact disabled, but whether the ALJ's decision "applies the correct legal standard and is supported by substantial evidence." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017); 42 U.S.C. § 405(g). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)). Apart from a legal error, however, the Court must accept the Commissioner's factual findings as conclusive if they are supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts in evidence, or substitute its judgment for that of the ALJ. *See McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). The ALJ must articulate an analysis of the evidence to allow the reviewing court to trace the path of reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ also has a basic obligation to develop a full and fair record, and he or she "must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

## ANALYSIS

In this appeal, Plaintiff argues that the ALJ committed a number of errors in her analysis of Plaintiff's RFC, and that these errors mandate a finding that the RFC is not based on substantial evidence. The alleged errors include an overemphasis on Plaintiff's daily activities, cherry-picking of Plaintiff's endocrinology records while ignoring concrete objective medical evidence indicating Plaintiff suffered from diabetic neuropathy, and failing to account for Plaintiff's challenges in seeking and implementing care advice and for medication side effects. The Commissioner argues in response that Plaintiff's alleged errors should be analyzed from the perspective of whether the ALJ properly rejected Plaintiff's subjective symptom complaints, because "[a]n ALJ's symptom evaluation and RFC findings are inherently intertwined" [DE[21] 26 at 4 (citing *Outlaw v. Astrue,* 412 F. App'x. 894, 897 (7th Cir. 2011) ("RFC determinations are inherently intertwined with matters of credibility")). According to the Commissioner, "an adverse subject complaint evaluation is [ ] a rejection of claims that conflict with the RFC determination." [*Id.*].

As discussed in detail below, the Court cannot say that the ALJ's view of Plaintiff's functional abilities lacks support in the evidentiary record given the deferential standard controlling judicial review of the ALJ's RFC finding. Further, the Court finds that any analytical error the ALJ might have made in arriving at Plaintiff's RFC could not have affected the outcome given the lack of evidence in the record to support greater limitations on Plaintiff's RFC than those imposed by the ALJ, even taking into due consideration Plaintiff's accounts of her symptoms.

---

[21] Citations to pages in the parties' briefs are to the page numbers assigned by CM/ECF at the top right.

## DAILY ACTIVITIES

The Court begins its analysis of the ALJ's RFC finding with Plaintiff's first argument, which is that the ALJ erred by overemphasizing her daily activities, and, more specifically, her "daily activity" of babysitting for her grandchildren. The ALJ's comments about Plaintiff's babysitting activities were made in the context of describing Plaintiff's symptoms[22]:

> Prior to the hearing, the claimant alleged her feet get numb, her back hurts, and her impairments affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, and use her hands, she cannot finish what she starts, and she is irritable. (Exhibit 3E). She also reported a myriad of symptoms including loss of appetite, fatigue, night sweats, headache, dizziness, blurred vision, hearing loss, cough, shortness of breath, chest pain, edema, and nausea, she could walk two blocks, stand five minutes, climb five stairs, and lift ten pounds. (Exhibit 10F). Yet, during the hearing, the claimant admitted she babysits her grandchildren ages 8, 7, 6, and 1, who live with the claimant, the claimant's husband, and the claimant's two daughters. She watches these four young children up to three hours per day, and 3 or 4 days per week. Despite this, during the hearing, the claimant reported she can only walk to her door without being short of breath, she takes an inhaler, she gets dizzy, and she left her last job because she lifted ten pounds and afterwards could not breathe, despite her prior reports of an ability to left [sic] ten pounds, as noted above (Exhibit 10F).

[AR 27].[23]

---

[22] The SSA "define[s] a symptom as the individual's own description or statement of his or her physical or mental impairment(s)." SSR 16-3p, 2017 WL 5180304, at *2 (citing 20 C.F.R. § 404.1502(i)).

[23] Although Plaintiff does not contend that the ALJ's description of her symptoms was inaccurate, the Court notes that the ALJ's description fails to convey the level of seriousness found in Plaintiff's Function Report. For instance, Plaintiff's Function Report states that Plaintiff suffers from pain in her feet, which sometimes "feels like someone grabs ahold of them with pl[y]ers" and other times "feel[s] like a bunch of bees are stinging [her] feet." Plaintiff also wrote that she could not take a bath because "I can't get out of tub; can't feel my feet to get up." She reported not being able to cook more than once a week because she cannot stand very long, her back starts hurting, and she cannot feel the tips of her fingers. When doing the dishes, she reported she could only do four glasses before having to sit down. She also said that she needs help picking things up because she cannot bend or lift. Finally, she wrote that she can walk only about one half of a block to one

While the ALJ's comments about Plaintiff's babysitting activities were not made in the context of rejecting Plaintiff's symptom reports as inconsistent with the record, still, the comments show skepticism of Plaintiff's symptom testimony due to her babysitting. The Seventh Circuit has criticized ALJs who infer an ability to perform full-time work from an ability to perform activities of daily living. *See Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016); *Moore*, 743 F.3d at 1126; *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). "But that is not what the ALJ did here. Rather, the ALJ evaluated [Plaintiff's] daily activities against her asserted impairments in assessing whether she was exaggerating the effects of her impairments." *Shumaker v. Colvin*, 632 F. App'x 861, 866 (7th Cir. 2015) (citing, inter alia, 20 C.F.R. § 404.1529(c)(3)(i) (explaining that the agency will consider daily activities in evaluating the severity of the claimant's symptoms), and *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013) (agreeing with ALJ's reasoning that claimant's daily activities undermined her testimony about extent of her symptoms)).[24]

Nevertheless, in the Seventh Circuit the ALJ has an obligation to "provide a 'logical bridge' between the evidence and [her] conclusions." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). The Court must be able "to trace the path of [the ALJ's] reasoning" from the evidence to the conclusion. *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). Here, it is not clear what symptoms the ALJ found inconsistent with Plaintiff's testimony about babysitting her grandchildren. Plaintiff testified that she babysits on average three or four days per week, and sometimes it may only be

---

block and then has to rest for a few minutes. [AR 201-205]. The ALJ's summary encompasses these reports, but in a non-detailed, superficial way.

[24] *See also Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (noting that ALJ discussed claimant's performance of activities of daily living but did not equate it with ability to work); *John S. v. Saul*, No. 1:19-cv-1008-DLP-JRS, 2020 WL 428093, at *9 (S.D. Ind. Jan. 27, 2020) (citing SSR 16-3p, 2017 WL 5180304, at *7 (directing ALJ to consider daily activities in evaluating the intensity, persistence, and limiting effects of the claimant's symptoms)).

for an hour. [AR 49]. It is unclear to the Court why a person who babysits under these circumstances could not also suffer from numb feet, back pain, loss of appetite, fatigue, night sweats, headache, dizziness, blurred vision, hearing loss, cough, shortness of breath, chest pain, edema, and nausea, or have difficulty standing, walking, lifting, squatting, bending, reaching, kneeling, or climbing. "If the [claimant's] allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant." *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994). Here, the ALJ's cursory questioning during the hearing about Plaintiff's babysitting shed almost no light on the credibility of Plaintiff's symptom testimony. Yet the ALJ cited to that testimony as if it were inconsistent with Plaintiff's reported symptoms.

Despite the above, the Court concludes that any error in the ALJ's treatment of Plaintiff's babysitting activities is not grounds for reversing the ALJ's RFC finding. In *Rennaker v. Saul*, 820 F. App'x 474 (7th Cir. 2020), the Seventh Circuit acknowledged that "the ALJ possibly misrepresented [the plaintiff's] daily activities with respect to caregiving." *Id.* at 479. But the court held that "the ALJ's mistake was harmless because the ALJ did not rely on [the plaintiff's] daily activities to the exclusion of other evidence; nor did he equate these activities with competitive work. He noted only that these activities suggested that [the plaintiff] was not as limited as he alleged." *Id.* at 480. Further, "the ALJ relied on the entirety of the record to discount [the plaintiff's] account of the severity of his symptoms." *Id.* Thus, the court concluded, "the ALJ did not 'overemphasize' [the plaintiff's] daily activities because the ALJ relied on other evidence, such

as the objective medical evidence and medical opinions—which constituted substantial evidence supporting the ALJ's credibility finding." *Id.* at 479.

Similarly, here, the ALJ never explicitly said she was relying on Plaintiff's babysitting in discounting Plaintiff's symptom reports. Instead, the ALJ cited to other evidence she found inconsistent with those reports, including Plaintiff's medical records and the opinions of the state agency reviewers and consultative examiner. [AR 28-29]. Accordingly, as in *Rennaker,* the ALJ's failure to build a logical bridge regarding her treatment of Plaintiff's babysitting activities was harmless.[25]

**DIABETIC NEUROPATHY**

Plaintiff's next argument is that the ALJ failed to properly assess her RFC in light of her diabetic neuropathy. This argument involves both the ALJ's alleged cherry-picking from Plaintiff's medical records and the ALJ's alleged improper reliance on Plaintiff's failure to follow prescribed medical treatment.

1.   **NON-SEVERE FINDING AT STEP 2**

Before discussing Plaintiff's arguments on this issue, the Court notes for context that the ALJ's discussion of Plaintiff's diabetic neuropathy occurred only at the step 2 stage of her analysis

---

[25] *See also Richards v. Berryhill*, 743 F. App'x 26, 29 (7th Cir. 2018) (while the ALJ's consideration of the plaintiff's activities of daily living was "shaky," the ALJ "sufficiently supported the credibility determination with other specific reasons supported by the record" (internal quotation marks and citation omitted)); *Kittelson v. Astrue*, 362 F. App'x 553, 558 (7th Cir. 2010) (ALJ's error in mischaracterizing the plaintiff's daily activities found harmless where the ALJ also "specified another, valid reason for finding her not credible: the discrepancy between her [symptom] testimony … and the evaluations of doctors who found no objective evidence of such impairments"); *Gomez v. Saul*, No. 18-CV-1049, 2019 WL 2524831, at *4 (E.D. Wis. June 18, 2019) ("agree[ing] that the ALJ's discussion of [the plaintiff's] daily activities has its flaws— he simply listed activities reported by [the plaintiff] without any accompanying explanation as to how these activities are consistent with the assessed RFC or inconsistent with [the plaintiff's] allegations," but concluding that the ALJ's "incomplete treatment of [the plaintiff's] daily activities did not render the entirety of his symptom evaluation 'patently wrong'").

as part of her finding that Plaintiff's diabetes was *not* a severe impairment. This finding was contrary to that of the state agency reviewer, who concluded that Plaintiff's diabetes *was* a severe impairment. The ALJ stated that the state agency reviewer's opinion on this matter was "unpersuasive" due to "the lack of treatment … and for the other reasons discussed above [i.e., at step 2]." [AR 29]. The ALJ's analysis at step 2 of why Plaintiff's diabetes was not a severe impairment consisted of the following discussion:

> Although the claimant experiences diabetes mellitus, and was referred to an endocrinologist, she failed to keep her follow up appointments. In fact, there appears to be a significant issue with medication compliance because on a handful of occasions, the claimant had simply stopped taking medications or checking her blood sugar for a prolonged period. She did not know her A1C. The record also indicates she was taking medications not prescribed to her, rather they were prescribed to a friend who had passed away. (Exhibit 17F/12). The claimant has treated her diabetes mellitus sporadically. Although there were some notes of neuropathy (Exhibit 19F), it was also noted the claimant had a "history of" neuropathy. (Exhibit 17F). Regardless, the claimant's gait was observed to be normal, and without the use or need of an assistive device. (Exhibit 9F, 10F, claimant's testimony). The claimant's diabetes mellitus causes no more than a minimal limitation in the claimant's ability to complete work activity and is a nonsevere impairment.

[AR 24].

"The standard for severity is not onerous—an impairment having anything more than a 'minimal effect' on [a claimant's] ability to stand or walk would have to be considered severe." *Davis v. Berryhill*, No. 18-cv-1694 (BMC), 2019 WL 919547, at *2 (E.D.N.Y. Feb. 25, 2019) ("conclud[ing] that the ALJ's finding that any peripheral neuropathy that plaintiff may have had was not severe was an unreasonable finding").[26] The ALJ's analysis at step 2 regarding the effect

---

[26] *But see Agan v. Astrue*, 922 F. Supp. 2d 730, 756 (N.D. Iowa 2013) (holding that substantial evidence supported the ALJ's finding that the plaintiff's diabetic peripheral neuropathy was a non-severe impairment where "[t]he ALJ analyzed the medical record concerning [the plaintiff's] diabetes mellitus and diabetic peripheral neuropathy, which indicated that [the plaintiff] 'has some

of Plaintiff's diabetes on her functional abilities consists of a single citation to the consultative examiners' reports and no analysis of any objective medical evidence in Plaintiff's treatment records. Nevertheless, Plaintiff does not challenge the ALJ's finding of non-severity as to her diabetes mellitus, and therefore any argument for finding error on that basis has been waived. *See Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020) (holding that "arguments omitted before the district court are [waived]").

Even apart from waiver, there is good reason in the record for the Court not to visit the issue *sua sponte*. It appears that it was Plaintiff's representative who specifically argued to the ALJ that Plaintiff's diabetes mellitus was not a severe impairment.[27] The Commissioner does not argue that Plaintiff would be bound in this appeal by the argument her representative made during the administrative proceedings, "and the Court is not aware of grounds for making such an argument." *James E. v. Berryhill*, 357 F. Supp. 3d 700, 703 (N.D. Ill. 2019). But, as one court has noted, "as a practical matter, counsel's failure to raise arguments in the administrative proceedings raises a question about how significant the alleged errors were," as well as "concerns about sandbagging." *Id.* Those concerns are even more pronounced where, as here, the error was an "invited" one.[28]

---

mild sensory deficits consistent with diabetic peripheral neuropathy,' but it was never the focus of his treatment").

[27] *See* AR 266 (Pre-Hearing Letter Brief) ("[T]he claimant has insulin dependent type II diabetes, neuropathic pain, hyperlipidemia, hypertension and exogenous obesity. These conditions represent less-than-severe impairments because, although they may be problematic, they are milder and there is no allegation that they portend disability.")].

[28] *See, e.g., Tracy v. Astrue*, 518 F. Supp. 2d 1291, 1306 (D. Kan. 2007) ("[T]he attorney clearly and unambiguously asserted to the ALJ that he did not believe that his client met a listing. It is therefore clear that plaintiff's counsel induced or invited the ALJ at step two to find that plaintiff did not meet a listed impairment. Therefore, the court holds that the doctrine of invited error bars the plaintiff from raising this issue on appeal.").

As a result of the ALJ's unchallenged step 2 non–severe finding, Plaintiff's arguments concerning the ALJ's treatment of her diabetic neuropathy turn on the rule that even non-severe impairments must be considered in determining a claimant's RFC. *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) ("In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even [limitations] that are not severe" (internal quotation marks and citation omitted)); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (the ALJ's RFC discussion "must [ ] consider the combined effects of all the claimant's impairments, even those that would not be considered severe in isolation").[29] In light of this rule, the Seventh Circuit has said that any error at step 2 of omitting an impairment from the severe category is usually harmless as long as at least one impairment is found to be severe and the ALJ goes on to consider all of the claimant's limitations from both severe and non-severe impairments in arriving at the claimant's RFC. *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019). Here, the ALJ found other severe impairments (COPD/asthma and obesity), and therefore proceeded to assess Plaintiff's RFC. Thus, "no matter what happen[ed] at step two, a correct assessment [of the severity of Plaintiff's diabetes] remain[ed] important." *Farrell v. Astrue*, 692 F.3d 767, 772 (7th Cir. 2012). The ALJ's later discussion of Plaintiff's RFC did not mention her diabetes or alleged diabetic neuropathy at all, plainly indicating that the ALJ did not think those conditions imposed any limitations on Plaintiff's RFC. As a result, the question in the end still comes down to whether the ALJ's brief step 2 analysis

---

[29] *See* [DE 25 at 16 n.36 (citing SSR 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.")].

concluding that Plaintiff's diabetes causes no more than a minimal limitation in her ability to complete work activity is supported by substantial evidence.

### 2.   CHERRY-PICKING ARGUMENT

Plaintiff argues that the ALJ's finding of no RFC limitations from her diabetic neuropathy is not supported by substantial evidence because of the ALJ's failure to discuss objective medical evidence in the record that Plaintiff suffered from diabetic neuropathy. "[D]iabetic neuropathy is 'a common, serious complication of diabetes' whereby nerves in the body—most commonly in the legs and feet—are damaged by the presence of high blood sugar throughout the body." *Coffel v. Colvin*, No. 3:14-cv-2067, 2016 WL 1237889, at *1 (N.D. Ind. Mar. 29, 2016) (citation omitted). But the ALJ only noted that Plaintiff had a diagnosis of that diabetes complication; there is no finding by the ALJ that Plaintiff suffered from the medically determinable condition[30] of diabetic neuropathy or diabetes mellitus with neuropathy. *See, e.g., Moritz v. Berryhill*, No. 14-cv-380-WMC, 2017 WL 2352034, at *4 (W.D. Wis. May 31, 2017) (noting that the ALJ's list of severe impairments included diabetes mellitus, but "did not include diabetic neuropathy … because, inter alia, "this diagnosis was not substantiated by objective medical findings, such as conduction and sweat tests"). Moreover, to the extent that the ALJ recognized Plaintiff had been diagnosed with diabetic neuropathy, her entire discussion at step 2 of that condition shows that she did not believe Plaintiff suffered from any functional limitations from it. And her discussion of Plaintiff's RFC shows that she found the degree of limitation reported by Plaintiff due to her foot pain, regardless of the medical reasons for that foot pain, to be inconsistent with the evidence. *See id.* (noting that

---

[30] A medically determinable impairment is one that "can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521. A physical impairment, such as diabetic neuropathy, must be established "by objective medical evidence from an acceptable medical source," and a claimant's "statement of symptoms, a diagnosis, or a medical opinion" is not sufficient. *Id.*

the ALJ "considered [the plaintiff's] subjective complaints of foot pain in limiting [the plaintiff] to sedentary work").

Plaintiff challenges these findings by citing her "diabetic foot exams on record [which] involve an abnormal [micro]filament test for both feet." [DE 25at 13]. Plaintiff argues "[s]uch test is an objective sign that the ALJ was due to at least weigh." [*Id.*]. While the foot examinations might be objective evidence supporting Plaintiff's diagnosis of diabetic neuropathy, they provide minimal support for Plaintiff's assertion that she suffers from functional impairments from diabetic neuropathy. The evidence cited by the ALJ, such as Plaintiff's consultative examinations, is more relevant to the latter issue. As the ALJ noted, those examinations indicated that Plaintiff's "gait was observed to be normal, and without the use or need of an assistive device." [AR 24]; *see, e.g., Moritz*, 2017 WL 2352034, at *5 (argument that the ALJ's RFC failed to consider the plaintiff's obesity in conjunction with her diabetic neuropathy "lacks traction because the ALJ found that [the plaintiff's] complaints of foot pain were not a medically determinable impairment, depending in large part on … the lack of objective findings or deficits in strength or sensation on physical exam"). Regardless of whether Plaintiff suffers from diabetic neuropathy as shown by her previous abnormal foot examinations, those examinations do not themselves indicate whether Plaintiff suffers from actual foot discomfort or functional limitations from foot discomfort.

Plaintiff's assertion that "nothing indicates that the consultative examiner performed a proper diabetic neuropathy exam" [DE 25 at 14] is flawed for a similar reason. Assuming that Plaintiff has the medical condition of diabetic neuropathy, the issue is whether she suffers any functional limitations from that condition. The consultative examination assessed Plaintiff's current functional limitations, and found, among other things, no limitations in fine fingering skills, normal extremities, normal gait, station, and ability to squat, walk on heels, walk on toes, and

tandem walk, normal posture and ability to get on and off the table, normal stamina and ability to ambulate effectively, normal muscle stretch and tone without atrophy, normal grip strength, normal strength in the upper and lower extremities, normal reflexes, normal sensory system, and normal range of motion in all areas. The examiner also found no pain, swelling, or stiffness, and no enlargement or effusion. Plaintiff asserts in a single sentence that, at the very least, the ALJ should have considered that her neuropathy might "wax and wane" and that the consultative examination with normal findings was done on a good day. [*Id.*]. But Plaintiff has not shown that the waxing and waning argument fits the facts. Plaintiff cites to no medical evidence of any waxing, and the Court's own review has found none. There is only medical evidence of the *lack* of functional limitations.

Finally, the cherry-picking cases on which Plaintiff relies are inapposite. The ALJ did not mischaracterize or neglect to consider any records that would support physical limitations from diabetic neuropathy. In fact, even the two medical reports cited by Plaintiff indicate that her extremities were normal and atraumatic, her pulses were 2+ and symmetric in all extremities, she had no neurologic focal deficits, and her range of motion and gait were normal. [AR 573, 580]. No medical professional opined that Plaintiff suffered functional limitations as a result of her diabetic neuropathy, and it would be inappropriate for the ALJ to infer such functional limitations from Plaintiff's foot examinations without medical interpretation of the results of those examinations on which to rely. *See Israel v. Colvin*, 840 F.3d 432, 439 (7th Cir. 2016) ("There is always a danger when lawyers and judges attempt to interpret medical reports and that peril is laid bare here.") (citing *Browning v. Colvin*, 766 F.3d 702, 705 (7th Cir. 2014) (noting that administrative law judges are not permitted to "play doctor")); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (an ALJ must rely on medical evidence or authority in the record in reaching

conclusions about a claimant's "ability to do certain things" in light of a medical diagnosis).[31] Plaintiff's argument that the ALJ cherry-picked from her endocrinology records is without merit.

### 3.   FAILURE TO FOLLOW PRESCRIBED TREATMENT

Plaintiff's second argument is that "the ALJ's approach to Plaintiff's treatment, side effects, more [sic], is problematic." [DE 25 at 15]. Plaintiff makes a number of somewhat unrelated assertions in this section of her brief, none of which are very convincing.

To begin with, Plaintiff asserts that the ALJ "fail[ed] to properly account for [her] challenges seeking and implementing care advice." Presumably, this vague contention refers to the "aerosol albuterol" and/or "nebulizer modality" that Plaintiff mentions later on, with a citation to her pulmonary treatment records that contain a brief notation about the former but nothing as far as the Court can tell about the latter. Plaintiff asserts that "the ALJ failed to account for the time and variation that is inherently involved in such regular nebulization," without telling the Court what "time and variation" *is* involved or explaining how the "time and variation" affected her ability to comply with treatment. Instead, Plaintiff cites to the Mayo Clinic's website, presumably so the Court can do its own research—without allowing the Commissioner to weigh in—to figure out what Plaintiff had in mind. Underdeveloped arguments are generally waived, *Overton v. Saul*, 802 F. App'x 190, 193 (7th Cir. 2020), and this argument clearly fits into that category. Moreover, Plaintiff does not explain where in the decision the ALJ cited to her failure to comply with treatment recommended by her *pulmonologist* as a reason for finding her not disabled or discounting her reported symptomology, and "the Court declines to go hunting on its own for"

---

[31] *E.g., Willard v. Colvin*, No. 3:15-cv-7-PLR-CCS, 2016 WL 6501215, at *4-5 (E.D. Tenn. Aug. 22, 2016) (rejecting argument that the ALJ's refusal to recognize the plaintiff's peripheral neuropathy as a severe impairment led the ALJ to improperly determine the functional effect of the impairment, where, among other things, the plaintiff's treating physician never made any assessment or recommendations about any functional limitations from his neuropathy).

the alleged error. *Meyerink v. Colvin*, No. 2:13-CV-327-PRC, 2015 WL 773041, at *9 (N.D. Ind. Feb. 24, 2015).

Plaintiff also claims the ALJ "criticized" her for "taking meds from a friend that has passed away," and she claims these medications were "identical in name and dose" to those that had been prescribed to her.[32] But the ALJ was merely stating what the evidence in the record *indisputably* shows—that "there appear[ed] to be a significant issue with medication compliance because on a handful of occasions, the claimant had simply stopped taking medications or checking her blood sugar for a prolonged period. She did not know her A1C, and she was taking medications not prescribed to her, rather they were prescribed to a friend who had passed away." [AR 24]. In the same discussion, the ALJ also noted that Plaintiff failed to keep many of her follow-up endocrinology appointments, another factual finding that is indisputably supported by the record.

Whether the ALJ was expressing disapproval by reciting these facts is not really the issue. The issue is whether the ALJ relied on these facts for an improper purpose. Plaintiff cites to the rule that "an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). But Plaintiff acknowledges this rule applies when an ALJ "attempts to discredit the symptomology of [a claimant] by delineated perceived failures in treatment." [DE 25 at 16]; *see* SSR 16-3p, 2017 WL 5180304, at *9 (an ALJ may "not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with

---

[32] The Commissioner notes that this latter information (along with the assertion that Plaintiff's doctor approved her taking her friend's medicines) is only found in her representative's brief before the Appeals Council and therefore is outside the record. [DE 26 at 7 (citing AR 167)].

treatment or seek treatment consistent with the degree of his or her complaints").[33] Here, the ALJ

did not discredit Plaintiff's alleged symptoms with her lack of treatment compliance. Instead, the

ALJ noted Plaintiff's treatment noncompliance as part of her step 2 finding that Plaintiff's diabetes

was not a severe impairment. More specifically, immediately after reciting the facts in question,

the ALJ acknowledged that the medical records contained "some notes of neuropathy" and also

reported "a 'history of' neuropathy," but then stated that, *"[r]egardless*, [Plaintiff's] gait was

observed to be normal, and without the use or need of an assistive device." [AR 24 (emphasis

added)]. In the very next sentence, the ALJ stated that Plaintiff's "diabetes mellitus causes no more

than a minimal limitation in [her] ability to complete work activities and is a nonsevere

impairment." *Id.; see* 20 C.F.R. § 404.1522(a). Plaintiff does not challenge the ALJ's step 2 finding

that her diabetes is a nonsevere impairment, and indeed, as previously discussed, her representative

invited the ALJ to reach that result.

     In *Luckett*, the court rejected the same argument Plaintiff makes here only pursuant to a

similar policy found in SSR 82–59, 1982 WL 31384 [superseded by SSR 18-3p, 2018 WL

4945641[34]], stating that the ALJ "found that [the plaintiff] did not have a disabling condition

*regardless* of his compliance or noncompliance with his medication," and therefore the policy in

question did not apply. *Luckett v. Astrue*, No. 11-CV-3342, 2012 WL 3485287, at *11 (C.D. Ill.

---

[33] The regulation cited in *Shauger* for this proposition, SSR 96–7p, was superseded by SSR 16-3p, but the old and the new regulations are alike in this respect.

[34] *See* SSR 18-3p, 2018 WL 4945641, at *2, 4 ("Under the Act, an individual who meets the requirements to receive disability… benefits will not be entitled to these benefits if the individual fails, without good cause, to follow prescribed treatment that we expect would restore his or her ability to engage in substantial gainful activity …. To make a failure to follow prescribed treatment determination, we will: 1. Assess whether the prescribed treatment, if followed, would be expected to restore the individual's ability to engage in SGA. 2. Assess whether the individual has good cause for not following the prescribed treatment.").

Aug. 15, 2012) (emphasis added); *cf. Gotz v. Barnhart*, 207 F. Supp. 2d 886, 900 (E.D. Wis. 2002)

("The ALJ did not base her finding on plaintiff's lack of psychiatric treatment. Rather, she noted

that the absence of treatment was one reason for attaching significant weight to the reports of Drs.

Spear and Kaplan. This was not error."). As in *Luckett*, the ALJ in this case "noted that [Plaintiff's]

medical evidence stated that [she] was not compliant with [her] diabetes medicine at various times,

but the ALJ found that [Plaintiff's] condition was not [severe] *even with* [her] noncompliance."

*Luckett*, 2012 WL 3485287, at *11 (emphasis added). In short, the ALJ did not cite to Plaintiff's

noncompliance to show an inconsistency between that noncompliance and Plaintiff's statements

about the severity of her symptoms from her diabetes. The cited inconsistency instead was between

any allegation of a severe impairment and the objective medical evidence.[35] Therefore, the policy

on which Plaintiff relies requiring the ALJ to first explore the reasons for noncompliance is not

applicable.

The Court also notes that even if the ALJ had cited to Plaintiff's failure to follow prescribed

treatment to discredit her symptom reports, that would not necessarily have been error in this case.

The ALJ "could have reasonably determined that [Plaintiff's] testimony [about her symptoms] was

not credible" given that she had "elevated blood sugar levels, she did not always comply with

dietary recommendations and [ ] her visits to physicians were 'intermittent at best.'" *Dixon*, 270

---

[35] *See, e.g., Forbes v. Comm'r of Soc. Sec.,* No. 1:20-CV-00479-SLC, 2022 WL 3210485, at *10
(N.D. Ind. Aug. 9, 2022) ("While in general, an ALJ must not draw inferences about a claimant's
lack of treatment without exploring the reasons for the inaction, the ALJ was not required to
conclude that [Forbes required greater restrictions] because there was a lack of medical evidence."
(internal citation omitted)); *McCorkle v. Comm'r of Soc. Sec.*, No. 1:20-CV-00459-SLC, 2022 WL
474004, at *5 (N.D. Ind. Feb. 16, 2022) (same); *Dross-Swart v. Astrue*, 872 F. Supp. 2d 780, 793-
944 (N.D. Ind. 2012) (where the plaintiff argued that the ALJ improperly dismissed her depression
and bipolar disorder due to lack of mental health treatment, court stated that "[a]lthough this may
be true, the claimant bears the burden of producing medical records to establish her impairment,"
and the plaintiff did not do that).

F.3d at 1179. While Plaintiff claims that the "lack of insurance played a role in her inability to follow through with care" [DE 25 at 16], the Ruling states only that the ALJ will "*consider*[ ] possible reasons [the] claimant may not comply with treatment." SSR 16-3p, 2017 WL 5180304, at *9 (emphasis added). "[T]he ALJ is not *required* to accept the explanations provided by the [c]laimant." *Cook v. Colvin,* No. 2:13-CV-30155, 2015 WL 430880, at *20 (S.D.W. Va. Jan. 30, 2015) (emphasis added). While the ALJ may question the claimant about the reasons for noncompliance at the administrative hearing, the ALJ is not required to that either. *See* SSR 16-3p, 2017 WL 5180304, at *9 ("We *may* need to .. ask why [at the hearing]…") (emphasis added). Here the reasons for noncompliance, including Plaintiff's insurance issues, are shown in Plaintiff's medical records, so the ALJ only needed to "review the case record to determine" what those explanations were. *Id.* at *10. Given the substantial evidence in the record of noncompliance unrelated to insurance issues, such as Plaintiff's noncompliance with dietary prescriptions, failure to monitor her blood sugar levels, and failure to follow the directions of the treating nurse practitioner to call the office when she had issues with side effects or costs of medications rather than to simply stop taking them, the ALJ could have reasonably rejected Plaintiff's insurance excuse for her noncompliance.[36]

---

[36] *See, e.g., Weaver v. Berryhill*, No. 1:16CV268, 2017 WL 4586228, at *8 (N.D. Ind. Oct. 16, 2017) ("Plaintiff argues that she failed to comply with treatment out of financial considerations, and could not maintain a proper diet to stabilize her blood sugar because of her gastroparesis, but neither sufficiently explains her failures. … Plaintiff's physician had suggested Plaintiff look into an indigent drug program to obtain glucagon. … [And Plaintiff] does not explain why [she] did not see a dietician as recommended, or why she failed to follow a special gastroparesis diet as [her doctor] had suggested."), *aff'd*, 746 F. App'x 574 (7th Cir. 2018); *Smith v. Colvin*, No. C12-1812-JCC, 2013 WL 5314999, at *7 (W.D. Wash. Sept. 20, 2013) ("Though Plaintiff points to some evidence that two of her diabetes medications were not covered by her insurance, the record is replete with other references to Plaintiff's failure to monitor blood sugars as suggested, failure to maintain her recommended diet and exercise, failure to take medications as prescribed, and failure to follow up as recommended. Plaintiff has not offered an explanation to the Court for these failures to comply with specific treatment, and the medical record contains no such explanation.").

Apart from the fact that the record contains substantial evidence that would have supported the ALJ's rejection of Plaintiff's explanations for her medication noncompliance, the Court also cannot say that the ALJ erred by not "explain[ing] [in the decision] how [she] considered [Plaintiff's] reasons," as required by the regulation. *See* SSR 16-3p, 2017 WL 5180304, at *9. As noted, the ALJ's discussion of Plaintiff's noncompliance with treatment was part of her step 2 finding that Plaintiff's diabetes was not severe, not her step 4 credibility determination. And remember that Plaintiff invited that finding so there was no reason for the ALJ to provide a more robust discussion of the reasons for her finding. Plaintiff's medical records reflect that her providers had repeated discussions with her concerning her failure to comply with treatment recommendations and to a large degree documented Plaintiff's reasons for not doing so. The ALJ was obviously "aware of and considered [Plaintiff's stated reasons], so any error in not highlighting them was harmless." *Kittelson*, 362 F. App'x at 557. The ALJ does not have to discuss every piece of evidence and, in this instance, it would be especially inappropriate to find fault with the ALJ for not discussing the matter, because Plaintiff led the ALJ to believe the severity of her diabetes was not at issue.

For the similar reasons, the Court also rejects Plaintiff's argument about the ALJ's failure to consider the side effects of her medications in combination with the functional limitations imposed by her severe impairments in assessing her RFC. *See* [DE 25 at 15-16]. The ALJ did question Plaintiff about her medication side effects, and Plaintiff reported that she was experiencing very few. [AR 58-59]. The record thus reflects that the ALJ "was aware of and considered [the side effects of medication], so any error in not highlighting them was harmless." *Kittelson*, 362 F. App'x at 557; *see also Labonee v. Astrue,* 341 F. App'x 220, 226 (7th Cir. 2009) ("an ALJ is not required to provide a complete written evaluation of each piece of evidence,

including the side effects of medication"); *Plump v. Colvin*, No. 2:12-CV-257-APR, 2013 WL 2425574, at *16 (N.D. Ind. June 3, 2013) ("The ALJ has no duty to make specific findings about the effects of a claimant's medications." (citing *Misener v. Astrue*, 926 F. Supp. 2d 1016, 1033 (N.D. Ind. 2013))).

Finally, as discussed in the next section, the ALJ's RFC finding is supported by "other explanations" unrelated to Plaintiff's failure to comply with treatment, so "this unexplained reason does not require a remand." *Behling v. Colvin*, No. 12 C 7028, 2013 WL 3819640, at *8 n.4 (N.D. Ill. July 23, 2013) (citing *Halsell v. Astrue*, 357 F. App'x 717, 722–23 (7th Cir. 2009) (stating "[n]ot all of the ALJ's reasons must be valid as long as *enough* of them are") (emphasis in original)); *see also Brown v. Comm'r of Soc. Sec.,* 425 F. App'x 813, 817 (11th Cir. 2011) ("if the claimant's failure to follow medical treatment is not one of the principal factors in the ALJ's decision, then the ALJ's failure to consider the claimant's ability to pay will not constitute reversible error").

## SYMPTOM TESTIMONY AND RFC

Although Plaintiff does not specifically argue that the ALJ erred in her credibility findings regarding her reported symptoms, as previously noted the Commissioner invites the Court to evaluate Plaintiff's arguments from that perspective. An ALJ must follow a two-step process when evaluating a claimant's symptoms. *See* 20 C.F.R. § 404.1529. First, the ALJ determines whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms. *Id.* § 404.1529(a), (b). Here, the ALJ found that condition was satisfied. [AR 27 ("The claimant does have underlying medically determinable impairments that could reasonably cause some symptomatology.")]. Second, once the existence of such a medically determinable impairment is established, the ALJ evaluates the intensity and persistence of the

36

claimant's symptoms to determine the extent to which they impose work-related functional limitations. 20 C.F.R. § 404.1529(a). As to the second inquiry, the Seventh Circuit has repeatedly criticized the use of boilerplate language in SSA ALJ decisions such as that used by the ALJ here.[37]

The ALJ began by stating that *"the pivotal question is not whether such symptoms exist, but whether those symptoms occur with such frequency, duration, or severity a*s *to reduce the claimant's residual functional capacity* as set forth above or to preclude all work activity on a continuing and regular basis." [AR 28 (emphasis added)]. This statement is similar to the Commissioner's characterization of the issue in this appeal, i.e., because "the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC" [DE 26 at 4 (quoting *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009))], the reverse is true, i.e. "an adverse subject complaint evaluation is . . . a rejection of claims that conflict with the RFC determination" [*id.*]. The ALJ's statement about the claimant's symptom reports "reducing" the claimants RFC—as well as the Commissioner's assertion that an ALJ can "reject" symptom reports that "conflict with the RFC determination"—err in "put[ting] the cart before the horse, in the sense that the determination of capacity must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion." *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *see Stark,* 813 F.3d at 688 ("Use of boilerplate is not automatically ground for remand, but it captures a deeper problem in the ALJ's analysis: the ALJ based her credibility finding on her finding about Stark's ability to work, but a proper assessment requires the reverse."

---

[37] *See, e.g., Stark*, 813 F.3d at 688 (deriding "the ALJ's use of language that this court routinely has condemned as 'meaningless boilerplate' and 'backwards' analysis"); *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) ("The present 'template' ... is even worse ...."); *Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011) ("There is no explanation of which of [claimant's] statements are not entirely credible or how credible or noncredible any of them are."); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("It is not only boilerplate; it is meaningless boilerplate.").

(internal citation omitted)); *Bjornson*, 671 F.3d at 645 ("imply[ing] that ability to work is determined first and is then used to determine the claimant's credibility … gets things backwards").

The ALJ next said that "a careful review of the record does not document sufficient objective medical evidence to substantiate the severity of the pain and degree of functional limitations alleged by the claimant." [AR 28]. This statement comes close to running afoul of the rule that "'an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.'" *Clifford v. Apfel*, 227 F.3d 863, 871–72 (7th Cir. 2000) (quoting *Cole v. Colvin*, 831 F.3d 411, 416 (7th Cir. 2016) (quoting *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015))). The presence or absence of objective evidence to support symptoms of the severity claimed is a factor that can be considered. *See, e.g.*, *Norton v. Astrue*, No. 3:07CV296/MCR/MD, 2008 WL 4057834, at *8 (N.D. Fla. Aug. 27, 2008). But "[i]f the medical record does not corroborate the level of pain reported by the claimant, the ALJ must develop the record and seek information about the severity of the pain and its effects on the applicant." *Clifford*, 227 F.3d at 872.[38]

---

[38] *See also Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015) (noting the recurrent error in decisions of Social Security ALJs of discounting pain testimony that can't be attributed to "objective" injuries or illnesses that can be revealed by x-rays, and collecting cases); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (an ALJ cannot disregard subjective complaints of disabling pain just because a determinable basis for pain of that intensity does not stand out in the medical record); *Pope v. Shalala*, 998 F.2d 473, 487 (7th Cir. 1993) ("[W]e cannot affirm the ALJ's decision simply because the objective medical evidence may not support the extent of pain claimed by [the claimant]. Instead we must evaluate all of the evidence, including medical evidence, [the claimant's] claims, and the evidence of her daily activities, as well as the ALJ's observations of [the claimant] herself"); SSR 16-3p, 2017 WL 5180304, at *6 (directing the ALJ to "consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and . . . evaluate whether the statements are consistent with objective medical evidence *and the other evidence*" (emphasis added)).

Lastly, immediately before launching into a discussion of the evidence, the ALJ said that, "[a]s for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because the evidence simply does not support such limitations as the claimant's [sic] alleged." [AR 28]. This statement comes closest to the correct regulatory standard that the ALJ recited earlier in her decision, which is that the ALJ must determine whether the claimant's symptom allegations "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(a).[39] Thus, while the ALJ gave lip service to several alternative formulations of the boilerplate language often used in Social Security ALJ decisions, the Court does not find error. Ultimately, the ALJ recited an accurate standard and then went on to point to evidence that justified her credibility determination. *See Pepper*, 712 F.3d at 367–68 (inclusion of boilerplate language in an ALJ opinion is not a fatal flaw as long as the ALJ pointed to evidence that justified his credibility determination).[40]

Here, the ALJ relied on the opinion of the state agency reviewing doctor in finding that Plaintiff had the residual functional capacity to perform light work. The state agency reviewer found that a limitation to light work was appropriate given Plaintiff's history of diabetes, obesity and neuropathy. The state agency doctor further opined that no additional limitations were required

---

[39] This is different from the "not entirely consistent" standard used in other ALJ decisions. *See Minger v. Berryhill, 3*07 F. Supp. 3d 865, 871–72 (N.D. Ill. 2018) (finding reversible error because the regulatory standard of "reasonably be accepted as consistent" is "not as rigorous" a standard as the ALJ's statement there that the claimant's symptoms were "not entirely consistent" with the evidence); *see also Christine C. v. Saul,* No. 19-CV-1981, 2020 WL 5702144, at *2–3 (N.D. Ill. Sept. 24, 2020) (discussing conflicting authority as to whether the "not entirely consistent" language is fatal if adequate further analysis is provided).

[40] That is not to say that the ALJ's use of multiple flawed alternative formulations (perhaps in the hopes that at least one will pass judicial muster) is a good way to approach the issue. As one district court pointedly observed, "[i]f ALJs really want boilerplate paragraphs in their opinions so badly, why not simply echo the regulatory language?" *Minger, 3*07 F. Supp. 3d at 872.

in light of the fact that Plaintiff's symptoms were above the listing levels (*see* footnote 19, *supra*). The ALJ rejected this aspect of the reviewing doctor's findings as not persuasive, however, because of breathing impairments shown in Plaintiff's medical records. Thus, the ALJ imposed additional restrictions in Plaintiff's RFC for climbing stairs or ramps only occasionally, stooping only occasionally, and never crawling, crouching, kneeling or climbing ladders, ropes or scaffolds. These findings were "more limiting than that of any state agency [ ] [reviewer], illustrating reasoned consideration given to the evidence [Plaintiff] presented." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019); *see also Gedatus v. Saul*, 994 F.3d 893 (7th Cir. 2021) ("The ALJ gave great weight to the state-agency physicians' opinions that [the plaintiff] could perform light work, with certain limits. Indeed, the ALJ assessed more limits than any doctor did, because he determined she could not stand or walk for 4 or more hours out of 84 and added other limits."). "The ALJ ... properly considered that the state agency physician[ ] also reviewed the medical record and concluded that [Plaintiff] could perform [light] work with less restrictions than those offered by the ALJ. 'The regulations, and this Circuit, clearly recognize that reviewing physicians ... are experts in their field and the ALJ is entitled to rely on their expertise.'" *Forbes*, 2022 WL 3210485, at *13 (quoting *Ottman v. Barnhart*, 306 F. Supp. 2d. 829, 839 (N.D. Ind. 2004)).

The ALJ also relied on the consultative examiner's findings that Plaintiff had normal range of motion in all areas and normal gait and station and sensation. The ALJ found these findings significant, notwithstanding Plaintiff's obesity, which the ALJ concluded could "be accommodated by light work" in light of the findings of "normal ranges of motion and intact strength noted throughout the medical evidence of record." [AR 29]. State agency consultants are "highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a(b)(1); *see also Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022) (same). It is

true that the ALJ noted "there appears to be a problem with [the physical consultant's] opinion" insofar as it "opines to the *least* the claimant can do, rather than as with a residual functional capacity, the *most* the claimant can do." [AR 29 (emphasis in original)]. The consultant answered "yes" to the question "do you think this individual is able to stand/walk for at least 2 hrs in an 8 hr day." [AR 469]. The ability to do light work requires a claimant to be able to stand or walk for at least 6 hours in an 8 hour day. *Diaz*, 55 F.3d at 306. The ALJ thus rejected the consultative examiner's finding as not persuasive "to the extent" that it was "meant to suggest the claimant can complete only sedentary work" because such an opinion would not be "consistent with the [findings of] normal ranges of motion, normal posture, and normal ability to ambulate." [AR 29].

But Plaintiff does not challenge this conclusion or argue that the consultative examiner did in fact mean to opine that Plaintiff's functional abilities were no greater than at the sedentary level of standing or walking 2 hours a day. Indeed, Plaintiff does not argue that the ALJ's analysis of the consultative examiner's report was flawed in any way. Nor does Plaintiff contest the ALJ's analysis of the state agency reviewer's findings. In addition, Plaintiff does not identify any unaddressed evidence that would support greater RFC restrictions than those the ALJ imposed. The only error Plaintiff identifies in the ALJ's evaluation of the medical evidence—the ALJ's failure to comment on Plaintiff's abnormal foot examinations—does not support any limitations beyond those found by the ALJ because, as previously discussed, no doctor opined as to what those foot examinations meant in terms of Plaintiff's symptoms or functional limitations from diabetic neuropathy. Substantial evidence supports the ALJ's RFC finding even accounting for Plaintiff's diabetic neuropathy, and the abnormal foot examinations by themselves do not contribute to or alter that analysis. *See Albert v. Kijakazi*, 34 F.4th 611, 616 (7th Cir. 2022) (citing *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (recognizing that, although an ALJ is

prohibited "from ignoring an entire line of evidence that supports a finding of disability," she is not required to "discuss every piece of evidence in the record") (internal quotations omitted)).

As the Seventh Circuit said in another case, "[a] fundamental problem is [Plaintiff] offered no opinion from any doctor to set … any [ ] limits[ ] greater than those the ALJ set." *Gedatus,* 994 F.3d at 904 (citing *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) ("More importantly, there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ.")); *see also Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) ("When no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error."). "[H]aving been diagnosed with [an] impairment[ ] does not mean [it] imposed particular restrictions on [Plaintiff's] ability to work ... It was [Plaintiff's] burden to establish not just the existence of the condition[ ], but to provide evidence that [the condition] support[s] specific limitations affecting her capacity to work." *Weaver v. Berryhill*, 746 F. App'x 574, 578-79 (7th Cir. 2018) (internal citations omitted); *see also Jonathan Daniel G. v. Saul*, No. 20 C 3160, 2022 WL 972407, at *2 (N.D. Ill. Mar. 31, 2022) (rejecting plaintiff's challenge to the RFC because he did not explain how the RFC failed to accommodate his alleged symptoms); *Forbes,* 2022 WL 3210485, at *13 ("[T]he ALJ adequately explained [her] reasoning behind the RFC formulation, and [the plaintiff] has not shown th[at] greater restrictions are necessary."); *Moritz*, 2017 WL 2352034, at *5 ("Even if the ALJ had erred, it would be harmless given [the plaintiff's] failure to explain how the ALJ's claimed failure to address her obesity adequately would have changed the RFC."). "The ALJ gave solid, substantiated reasons for giving more weight to the state-agency physician['s] opinion[ ] than to [Plaintiff's] claims about the limiting nature of her symptoms. [Plaintiff] bears the burden to prove she is disabled by producing medical evidence. Yet she failed

to show how her medically determinable impairments caused any limitations beyond those the ALJ found." *Gedatus*, 994 F.3d at 905 (internal citations omitted).

"When assessing an ALJ's credibility determination, [the court] [does] do not ... undertake a *de novo* review of the medical evidence that was presented to the ALJ. Instead, [the court] merely examine[s] whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). "Finding the ALJ's [RFC] determination reasoned and supported by substantial evidence, [the Court] declines [Plaintiff's] offer to substitute [its] judgment for that of the ALJ's." *Grotts*, 27 F.4th at 1279–80. And because the ALJ's decision is so overwhelmingly supported by the record, and neither Plaintiff nor any medical professional opined that Plaintiff had specific restrictions beyond those imposed by the ALJ, a remand is not warranted by any errors or omissions in the ALJ's analysis. *Lockett v. Saul*, 834 F. App'x 236, 239 (7th Cir. 2020); *see McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (quoting *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.")).

In sum, despite "colorable arguments" in Plaintiff's favor, the Court "will not reweigh the evidence." *Gedatus*, 994 F.3d at 901. Still, nothing in this Court's opinion should be read as precluding Plaintiff from alleging disability arising out of her diabetic neuropathy were her condition to get worse in the period in which she remains insured (through December 21, 2023 [AR 23]). Diabetic neuropathy is a chronic progressive disease.[41] Evidence of diminished or non-

---

[41] *See Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015) ("Hill contends … that she gradually experienced worsening health problems that eventually became disabling in June 2011, shortly before she applied for benefits. Indeed, the ALJ found that Hill suffers from degenerative joint disease (osteoarthritis), which often grows more severe with the passage of time."); *Roddy*, 705

existent sensation in the feet or legs that is expected to continue for at least twelve months without improvement from medications, combined with reporting of significant foot pain or numbness leading to specific limitations in ability to walk or stand--none of which is found in the current record--could very well impose greater limitations on Plaintiff's RFC than were found here. At the very least, such evidence might require the ALJ to do more than the ALJ did in this case to investigate the impact of this condition on Plaintiff's ability to work in order to build a logical bridge.[42] In short, nothing the Court has said in this opinion should be read to prohibit a finding of

---

F.3d at 637 (ALJ's reasoning flawed because it ignored the fact that "degenerative" conditions get worse over time).

[42] *See, e.g., Stahl v. Colvin*, 632 F. App'x 853, 854-55, 861 (7th Cir. 2015) (where the plaintiff repeatedly sought treatment for burning pain, numbness and tingling in the arms and feet, as well as a sensation of pins and needles in her extremities, court holds that the plaintiff's "peripheral neuropathy, which was barely mentioned by the ALJ, required a much harder look"); *Davis,* 2019 WL 919547, at *3 (remanding for ALJ to reevaluate the plaintiff's RFC in light of the "abundant evidence [in the record] of numbness, swelling, decreased sensitivity and falling as a result of peripheral neuropathy"); *Worley v. Comm'r of Soc. Sec.*, No. CIV-18-713-G, 2019 WL 2553298, at *3-4 (W.D. Okl. May 1, 2019) (remanding for reevaluation of the plaintiff's alleged inability to stand or walk for any length of time due to his neuropathy where there was no acknowledgement of the consultative examiner's finding of hypoesthesia or discussion of the plaintiff's frequent appointments seeking treatment for neuropathic pain); *Bancolita v. Berryhill*, 312 F. Supp. 3d 737, 741-45 (N.D. Ill. 2018) (finding that the ALJ failed to affirmatively develop a proper administrative record during the hearing by not asking the plaintiff any pertinent questions about what she can do given that her medical records showed a loss of sensation in both upper and lower extremities from diabetes); *Coffel*, 2016 WL 1237889, at *4 ("It isn't difficult to imagine that someone's constant feeling of pins and needles in their feet and/or legs and persistent pain in these areas could prevent them from performing even sedentary work. The ALJ needed to do more to investigate the impact of this condition on [the plaintiff's] ability to work, particularly in the face of two treating physicians' opinions that [the plaintiff] couldn't work due, at least in part, to this condition."); *Bracken v. Sullivan*, 762 F. Supp. 247, 250 (S.D. Ind. 1990) (court finds claimant presumptively disabled and remands for an award of benefits where, among other evidence, a consultative examiner found that the plaintiff was suffering from diabetic peripheral neuropathy with touch and pain sensations markedly lower below both knees and diminished knee and ankle reflexes on both sides, an electromyelogram showed generalized neuropathy, and a neurosurgeon concluded that the claimant suffered from numbness and decreased sensation in all four extremities as well as decreased reflexes).

disability in the future. On the current record, however, the Court must affirm the Commissioner's decision to deny benefits.

## <u>CONCLUSION</u>

Based on the foregoing, the Commissioner's final decision is **AFFIRMED**. The Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in favor of Defendant and against Plaintiff.

ORDERED this 30th day of September, 2022.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT